Thank you, Judge Smith, and may it please the Court. How many arguments for you, total? This would be 17, Judge Smith. 70? 17. 17. All right. Okay. You're way behind some of your colleagues from the district, but. But so I'll begin with the anonymous tip in this case. The police department needs to get these drug dealers out of my park. They're in a gold Corolla parked near Tanglewood and Bonner streets. That is the anonymous tip that was communicated to Officer Ricky Jacobson in this case, and on the basis of that tip alone, Officer Jacobson proceeded to pull behind Jacob Wright's lawfully parked car with her emergency lights activated, order him to stay in that car seconds later as he started to get out, and then ordered him up against his own car and frisked him seconds after that. This all happened in a matter of eight seconds. Everyone below, the district court, the trial prosecutor, and of course the defense agreed that the information Officer Jacobson knew and had learned up until the frisk, including the tip, was not enough to generate objectively reasonable suspicion. That was correct. The tip itself was bare bones, and up to the frisk, the officer had verified only the static, easily observable detail that a gold Corolla really was in a place where it was said to be, and she had testified that she had seen nothing consistent with drug dealing or otherwise indicative of criminal behavior, and most importantly, she was aware of several indicia of unreliability. There were at least three things available to the officer, as I understand it, and I'm summarizing. Number one, there was the information from the anonymous tip. Number two, the information in the tip that the officer visually confirmed, and number three, the officer's knowledge and experience suggesting that the location was known for a high crime area and drug activity, and of course we do put a lot of stress on that final factor. Yes. Do you agree that all three of those things combined? You accurately recount the things that the officer knew as of the time, that at any one of the three points at which we contend that the seizure occurred, of course, as I was about to say, the thing that the district court went astray on here and the reversible error is that the district court relied on information that occurred after the frisk in order to justify reasonable suspicion, and of course decades of precedent tells us that officers can't justify a seizure or a search based on observations they make or facts they learn after the Fourth Amendment has been implicated. So that is the reversible error here, and the government's contention for the first time on appeal is that it's actually the tip that gave this officer reasonable suspicion to affect a seizure, and you're right, Judge Smith, the government does rely on high crime, but I'd like to address that up front and be clear about it because I think what the government's reliance on that factor, and you're right, the court does rely on high crime, but it relies upon it in a specific way. Here we're talking about an anonymous tip, so the threshold inquiry before we can assume that any of the things that the tipster said he saw happened is whether or not that's reliable. High crime comes in to decide if conduct that an officer has observed or knows has happened can fall on the suspicious side of the line, right? For instance, if an area is a high crime area and an officer observes ambiguous conduct, the fact that it's a high crime area allows the officer reasonably, in the Fourth Amendment jurisprudence view, to decide, I think that that's suspicious, and to interpret that as suspicious as opposed to innocent. So the defense that we would have in a case like that would be, oh, well, that could easily be innocent conduct. But your point is that not everybody who goes to that park can be searched simply because they're at that park. Exactly. That's the only thing we know about them is that they're at that park that doesn't allow officers to search them. That's your argument. Precisely. Can I ask you, on this issue of whether it was, you know, whether the search and seizure sort of began when the officer pulled up, what is your best case for the proposition that an officer pulling up behind a car with red and blue lights flashing is it? What's your best case that stands for that proposition? Well, I would say two things. The cases we cited in the brief, there's, this is going to be, you know, hard to, State v. Gonzalez is the Tennessee Supreme Court case, or Tennessee Court of Criminal Appeals case we cited. There's People v. Brown, which is the Supreme Court of California. And then there's, of course, I think it's the opposite, Gonzalez v. State, or in Gracia Cantu v. State, that come out of the Texas Court of Criminal Appeals. And so it is clearly established law in the state of Texas, in fact, that pulling up behind with red and blue lights flashing can communicate to a reasonable person that they're not free to leave. And of course, we would presume that the officer is aware of the law governing her jurisdiction. The best case out of this court that I can cite is the case that I included in my 28J letter, United States v. Morris, as cited earlier this year. And in that case, the court juxtaposed what happened there. The officers had flagged down a man as he was slowly driving out of a gas station and basically indicating to stop, and they said, just, that, that was almost, or that was, that could be a show of authority that communicates you can't leave in just the same way as flashing lights communicate that. And I want to be very clear, Judge Haynes, we're not asking you to write an opinion here that says any time police flash their lights, that's going to be a seizure. You can readily imagine scenarios where... Yeah, I drive down the highway and police officers are going somewhere else, and so I have to pull over, but that, I don't think they're, I hope they're not after me. You were not seized, and I have a personal experience far outside the statute of limitations. I was driving as a 16-year-old too fast next to a school, and an officer coming the opposite way saw me, and he flashed his lights at me. He very clearly communicated to me, you need to slow down, son, or I'm going to turn around, but he didn't, and I didn't feel like I was seized, and so, of course, lights can, in certain situations, not be a seizure, but here, all of the factors suggest they were. The officer, in fact, the officer's testimony made clear that she believed that she was seizing him the entire time. That's the entire reason that she testified it was odd for him to get out of the car, because it's odd for people who are seized, subject to a traffic stop, to get out of their car, but she did not say that it was suspicious, and most importantly, she did not say it was consistent with anything that was alleged in that tip, and that, of course, is what we're looking at here. We're trying to figure out- But if Mr. Wright didn't treat it that way, then how does that play into the matter? Because he wasn't listening to what the officer told him. It's true, Judge Haynes, that he did not listen at the very first instance, because when she continued to get out, that is not complying with orders, no doubt, and he has to suffer the consequence of what could happen there. I would never advise anybody to not comply with a police officer's order, but the difference is what the seizure test looks at is are you free to leave, and the way that you have not submitted to authority is if you have actually left and fled. So Hidari D., the landmark Supreme Court case on this, involved police officers who came across young men who immediately scattered, and the officers started to pursue them on foot, and then Hidari D. was one of the men who happened to have bad luck. He turned the corner, and he was right in front of the officer, so he turned around and saw the officer, and he tried to argue that when I saw the officer chasing me, I was seized, but the problem is he had never submitted to the authority. That's totally different here when you have a person who turns off his car, indicating I'm not going to be leaving this situation, and stands up and opens up, comes to a standstill slowly, puts his hands like this, his keys in hand, visible, and politely addresses the officer, ma'am, I haven't done anything. That is a submission to authority every day of the week. It may not be complying, I'm a military child, and so the way I analogize this is the difference between disobeying a superior officer's order, which of course will get you in trouble, but is different than going AWOL, right? If you disobey your superior officer's orders, you are still submitting to the church, like to the military, and you understand that that is still your superior officer, and you're going to deal with the consequences, but going AWOL is saying I'm not going to be under the military jurisdiction anymore, I'm getting out of here, and I think obviously it's not a tight analogy, and it doesn't map on exactly, but what we're saying here is that when you stay on the scene, it cannot be the difference, I think if you follow the government's position on this to its logical conclusion, if an officer tells somebody who's in a building, hey, you need to stay right here, go stand in the right corner of the room right now, and I'm about to talk to you, and the person goes and stands in the left corner, that they somehow wouldn't have submitted to the authority, of course they have, they've just not complied with the order, but not complying with an order is not leaving the situation, right? They're still submitting, he's got his keys in hand, there is no suggestion. The government, I think we would all agree, has shifted positions in this case, and I was struck by its response on Friday, three days for argument, with what I took to be perhaps a new position, there have been so many, so clarify for me where the government says, yes, we all agree that stopping your vehicle pursuant to a police command, visual signal constitutes a seizure, but Wright was already stopped, and then goes into what happened. Is that a totally new position by the government, or is that simply an iteration, or a restatement of a position that's already made, that because he was stopped, turning on your lights meant nothing? That part, I will say, Judge Parkstale, I'm not entirely sure about when the government's position is, because in the briefing, the government didn't exactly clarify it, it kind of said, if the court determines that it's the lights, then this, if the court determines it's the frisk, then this. Our position, obviously, is it's the lights plus the stay put order, and then at the very last point, it's the frisk. I will say that I agree with you that the government did reiterate its new argument on appeal that there was not submission to authority here, because the trial prosecutor did not in any way suggest to Judge Tipton below that there was no submission to authority here, and in fact, the officer recognized in her testimony said, she admitted in her testimony that Mr. Wright looked her in the eye, and that he didn't move in any way that suggested he was leaving, he didn't run away, and that he immediately complied with the order to put your hands on the hood of your car and drop your keys there. Judge Tipton did that immediately, and that all happened within eight seconds of her showing up, and so I would say that that's a brand new position on appeal, and we obviously disagree with it. I do want to touch on the- Well, we can't keep changing our minds, so when we are ready to write an opinion, it actually has impact on other cases, although obviously the focus is on the case we're deciding. So if you were writing this opinion, what is the standard you are articulating? I just want to make sure I'm very clear on what your position is on what is that last paragraph or maybe that first paragraph in our opinion that should set the standard. And are we talking about seizure here or tip? Because I can give you both. Well, I think what constitutes a seizure, which would potentially- It matters whether there's a tip and et cetera, et cetera, so I'm asking you, I'm not going to say what I might write if I were writing the opinion, I'm asking what you would write. What I would write is I would reaffirm the principle that an officer can seize an individual by show of authority when they clearly communicate to the defendant that they're not free to leave by their actions, and that performing a three-point turn and then pulling up swiftly behind a car with lights activated and then seconds later ordering the occupant of that car to stay in that car qualifies as a seizure by show of authority because nobody in that situation would feel free to leave it. And that way you can write the opinion in a more narrow ground. You do not have to say that it's just the lights that qualify as a seizure. You can say it's the lights plus the order to stay put, and at both of those points there's nothing that the officer has observed. In fact, she testified, as I pulled up on this car and approached it, I didn't see any evidence of drug dealing. I didn't see anybody gathered around this car. I didn't see people exchanging money. I didn't see remnants of a drug transaction. It was lawfully parked. We were in broad daylight at 445 on a sunny July day. Nothing that indicated criminal activity to her, and so all she was relying on is this tip. This tip is gold Corolla in a place there's human beings. They weren't described. They weren't identified. We don't know if they're male. We don't know if they're tall. We don't know if they're heavyset. We don't know anything from this tip, and all we know is that the tipster claims they're drug dealers. I have a very short amount of time left, so I just want to leave you with a bit of a preview of a response to what I believe the government will argue. The main problem with the government's argument about the tip here is it relies on an expanded version of the tip based on the tipster's testimony a year later, but you can't do that when you haven't proved that the dispatcher actually knew anything, and the best evidence of what the dispatcher's knowledge was was the dispatcher's contemporaneous written record of what the tipster said, and that is simply gold Corolla, drug dealers, Tanglewood Drive. Thank you. Yes, you've saved time for about a minute. Thank you. Mr. Chappell? Mr. Chappell, you wrote the 28-J letter on Friday. Is this a point about, we all agree stopping a vehicle pursuant to command of a visual signal constitutes a seizure, but he was already stopped, et cetera, et cetera, et cetera. Is that a variation on a theme, or is this a whole new position the government's espousing? Your Honor, may it please the Court, it is not a whole new position. Our position has long been that the detention occurred at the time of the pat-down, or more actually submitted to a show of authority by complying with the command that he turn around and put his ... All right. Let me restate the question then. Is it a new position that turning your lights on is immaterial if you've already stopped? That's what you're saying in your 28-J letter. We've got so many different iterations here, but I want to know that. When a vehicle is stopped, turning on your lights is as if it didn't happen because it's already stopped. Is that a new position? It is not immaterial, no. It is not as if it didn't happen. It's just one step of the ... No, sir. Is it a new position that the government is taking? You've stated so many at the suppression hearing, then in your brief, now this. I just want to ... All of this is pretty cloudy, so is this a brand new position the government is stating? Turning on your lights when a vehicle is stopped is immaterial.       Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. This is not a new position, Your Honor. It's not that it doesn't matter. It's that the lights go to one part of the test. Why do you say that then in this letter? Wright was already stopped when the lone police officer pulled behind him. This makes a difference. Because he was already stopped, turning on the lights doesn't count. So, the Supreme Court has made clear what the standard is for when a detention occurs, and one of those is that, one, the officer must show authority under circumstances where a reasonable person would not feel free to leave, and the person must actually submit to authority. And so, your question goes to that first part. That's the Mendenhall test, the free-to-leave test. Yes, an officer's use of their overhead lights is certainly one factor that goes towards showing a reasonable person would not feel free to leave. But what is absent in this case is the submission to authority, and that is what the government's submission is. And so, to respond to Judge Haynes, the first paragraph of your opinion should be the standard that we already know is the standard from the Supreme Court, and that comes from California v. R.E.D., and also is reaffirmed in Torres v. Madrid, and that is that a Fourth Amendment procedure occurs in one of two scenarios, one being the application of physical force with the intent to restrain, the other being a show of authority plus actual submission to that authority. And so, it wasn't just when Officer Jacobson pulled up behind Wright and turned her lights on, he was already stopped. He's not submitting to any authority at that point. It also wasn't just when she commanded him to stop, because again, he's not submitting to that authority. He's doing the opposite of submitting to that authority. He's disobeying those commands. And so, it's like Hidari D. In Hidari D, we have- How did he disobey those commands? He exited the vehicle when she very clearly three times told him to remain in the vehicle. And the district court found that R.O.A. But he did not in any way attempt to break free. He just stood there. He made no effort to run, for example. The rule should not be that one must run in order to avoid submission to authority. He did not submit to authority by actively disobeying commands. The district court found- Stay in the car. Then it was get out of the car. Then it was put your hands on the car. I mean, there was just a lot of- It was stay out of the car. I mean, I'm sorry. I apologize. It was stay in the car. Stay in the car, but then it was stay out of the car. It was stay in the car until the moment he was seized. She said, stay in the car, stay in the car, stay in the car. He exited. He heard that command. The district court found as much in the record. He heard that command, but he disobeyed it. He exited the car. He shut the door behind him. Not only that, he approached officer Jacobson in what was viewed as an aggressive approach. The video clearly shows this. He sticks his arms out. He's confrontational. This is not a arms up, I am surrendering to your authority. He's confrontational. The district court found- What do you base that on? The video? The video and the record, your honor. How is he confrontational other than stretching his arms out? Does he say something? He says essentially what? What? Again, we're on clear air review regarding these facts. The officer testified that she viewed this as, quote, unusual and also that it was kind of an aggressive approach. The district court found that it was reasonable for her to have cause for concern based on the way he exited the car. This is not a new approach from the government. The district court, Judge Tipton asked the prosecutor specifically, when is the government's case implicated? And then clarified, so it wasn't when she pulled up behind the car, it wasn't when he exited the car. It was when she actually made physical contact with the defendant. And we said, yes, your honor, that's ROA 193 and 94. And the first time she made contact with the defendant was the pat-down. Was the what? The pat-down. The time where she implicated Terry Frisk, your honor. And also, of course, this reasonable suspicion inquiry is reviewed de novo and this court can't affirm on any basis supported by the record. And so, to determine what the court can consider, it necessarily must determine when the detention occurred. And I want to clarify the government's position today. Aren't we bound by, or at least in the sense bound, we have to rely on the position you took in district court. We can't just change your position for you. Yes, we can affirm on alternate grounds the record provides, but we have to start with what your assertion is. We can't let you assert one thing in district court, then come up here as you're doing and assert another and say, well, we can affirm on any basis. I disagree that it's a contradiction, your honor. In the district court, on ROA 193-94, we said that the detention occurred at the moment of the initial physical contact with the defendant. I am in here today saying the same thing. The detention occurred at the time of the pat-down. So it's not inconsistent, your honor. We are merely providing reasons for why the detention did not occur earlier than that. I agree with the way you've stated it, which is that we can affirm on any basis that appears in the record whether or not it was raised. And the authority for that is Palmer v. Wachihatchee School District, which I wrote several years ago, and it's the law of the circuit. So you're absolutely right about that. Yes, your honor. I agree, obviously. Thank you for that. I may not have been, you may not have understood my question of your opponent on sort of how we write this opinion or write that paragraph. Obviously, we know the general standard. The question is kind of how we write, how it applies here, you know, what the specifics are, and I'm still a little bit unclear where you all stand on the notion of the pulling up with the lights, since there's been some changing in your, y'all's analysis. The pulling up with the lights was not a Fourth Amendment seizure because there was no submission to authority. The defendant did not stay put, he exited. He did not comply with commands, he disobeyed commands. But it otherwise would be? Otherwise in what sense? If he'd stayed in the car. If he had stayed put in the car and allowed the officer to approach him, I'm not conceding that that's a Fourth Amendment detention, no, your honor. We know from the Flowers case that the mere surrounding of police vehicles of a parked vehicle is not necessarily a Fourth Amendment detention. There's no Fifth Circuit case that holds as much. And again, we know here that Officer Jacobson had a non-threatening approach. She was outnumbered. There's two occupants in this vehicle and it's just her on the scene. We also know that this is a potentially volatile situation. We have a caller who's threatened to use his AR-15 if the police don't respond. We also know that caller's on scene. The caller seems more dangerous than Mr. Ride. Dangerous, yes. But obviously that's not how we want citizens to respond to these circumstances. But it doesn't make the situation any less volatile. And it certainly allows this court, it allows the district court to understand why Officer Jacobson would arrive and would put her lights on to show everyone, I'm here, I've got the situation under control. And what this detention point does is it allows the court to consider the defiant and kind of aggressive behavior that Ride exhibited upon Officer Jacobson's arrival. And that's important as part of the totality of the circumstances. So Judge Smith, I know you talked about three things that were part of the court's reasonable suspicion analysis or that will be part of the court's reasonable suspicion analysis. And the court should also consider that behavior. That behavior is important. And this court's decision in Micheletti, the court reasoned that the unusual confrontational behavior of someone, even though it's not inherently criminal, can give rise to reasonable suspicion, especially when coupled with a potentially volatile situation. In Micheletti... Of course, I dissented in that inmate case, but I was unsuccessful. So I have to acknowledge that that's the law of the circuit. It was a mistake, but it's well established. That's true, Your Honor. It is the law of the circuit. And the way that the majority opinion described that circumstance was that we have a large imposing man heading toward the officer with a defiant attitude. And when we compare Mr. Wright to Officer Jacobson's small stature, we have a large imposing man heading towards her with a defiant attitude. Now, wait. Heading towards her? There is testimony in the record that he was approaching her. Yes, Your Honor. What does the video show? The video shows him take a step and put his arms out like... He stops after he takes a step. Well, again, we're talking about a matter of just moments. And so by that time, Officer Jacobson has approached him, and finally, for the first time, he complies with her command to turn around and put his hands on the car. He puts the keys on top of it. I want you to clarify for me, because Judge Smith and I viewed this probably differently over the years about any basis in the record, and I recognize we're bound by the rule of law. In a suppression hearing, if you argue one basis to the judge, basis A, that the seizure occurred when the pat-down occurred and she handcuffed him, etc., then you come up here, I'm not saying you're doing this, you argue, no, the seizure occurred when the car, when she pulled up behind the car. We can only look at the position the government took to the judge to convince him, can't we? No, I disagree with that. But also, we are absolutely not taking the position, we have never taken the position that merely pulling up behind him was enough for a . . . I understand. This is just a hypothetical question. I'm sorry. I'm trying to see whether you agree that if you take position A in the district court, then you come up here and take position B, then in effect you've waived that position by not taking it to the district judge so he could try the case or decide the facts based on your position. We can't just have issues raised willy-nilly. I agree with that premise. I disagree with its application to this context because the question here is were Officer Jacobson's actions constitutionally reasonable? Was the warrantless search justified? We've always taken the position that it was. And then you can add to that . . . I'm sorry. Was the what justified? The warrantless search was justified under the Fourth Amendment. And that's obviously our position today was our position at trial. It also . . . I'm sorry, in the suppression hearing. It also makes sense why the trial at USA approached it the way that she did. If you look at the record, the written motion to suppress likewise does not identify a point of detention. It just says the officer lacked reasonable suspicion to conduct a terry stop. And so then you get to the suppression hearing, we go through the testimony, there's still no clarification of the defendant's position. But we talk about all the facts. There's questions on both sides to all the facts. And then you get to the government's argument and the government covers all of its bases. The government says, well, throughout the encounter, the officer's actions were reasonable. And that's exactly what we're arguing today. But didn't you in the district court say to the judge, yes, the seizure occurred with the pat down or the handcuffing or whatever? I think because he asked you to clarify your position. That's correct. The seizure occurred at the time of first physical contact, which was the pat down. And that's exactly my position today. So you never said in district court to the judge there was no seizure when the lights were turned on because the vehicle was stopped? The court found that. The court found that Terry was not implicated at that point. So that issue was certainly before the judge. Well, that's a finding of fact that we'll review under the clearly erroneous standard. But the government never took that position, did it? The government never took the contrary position. It took the position that the detention occurred later when the pat down occurred. So you cannot now in your brief or before us try to shift that position? Your Honor, it's not a shift in position. Respectfully. Well, that's subject to interpretation, counsel. I don't think the government has the burden to disprove every point where a detention occurs. Certainly don't. Okay. Thank you, Your Honor. One thing with regard to the tip. This is a stronger case than Navarrete. And of course, in Navarrete, the Supreme Court upheld the existence of reasonable suspicion based on an anonymous tip. First of all, what can this court consider with regard to the substance of the tip? Mr. Wright would have you limit yourself to what was in the shorthand in the call summary log. We know that the shorthand, Officer Jacobson said, that's only a piece of the call that appears on the screen. That's RLA 188. She also, in response to several pointed questions about the substance of the tip, she said, I'm going with what's on the transcript. I don't know exactly what the phone conversation was with dispatch. So that's RLA 17576. So how do we know what was said to dispatch? We asked the caller. And that's what we did. And so the caller came in and testified, I reported to 911 that there was a gold Toyota Corolla at the pavilion at the park doing a re-up, giving drugs to transients that deal in the park, and the police need to come get them out. So it's that entire substance of the tip that should be within this court's consideration. Of course, that is because of the collective knowledge doctrine, right? We know that under United States v. Hinsley, you just need some degree of communication between the law enforcement officials, and then the government needs to substantiate the basis for the information in police channels and suppression. But the officer making the stop has to have the reasonable suspicion. But what the court considers is the collective knowledge of the officers. So now you're making it plural, the officers? Of the law enforcement officials. The government's position is that. I'm making that plural or singular, the law enforcement official or officials. Plural. Plural. You can impute the knowledge of one officer to another, provided you satisfy the standard for collective knowledge. And again, that's United States v. Hinsley. And what's required there is some degree of communication between officers. We know that occurred here. We know that Officer Jacobson relied on the 911, that's ROA 183. We know that dispatch relays information. We also know that dispatch is actually involved in the decision making. The dispatch screens these calls and makes a determination of whether to send someone out. And if they have a question, it goes through dispatch. That's, I mean, I'm sorry, it goes through a lieutenant. And so this is not a unilateral decision by the officer on the scene. There is that communication. We can impute the knowledge from the 911 call to the officer on the scene. That's classic collective knowledge. It's not dissimilar from a situation where an officer develops reasonable suspicion on his or her own, say maybe through surveillance, and then talks to a local police officer and says, stop this vehicle when it leaves the apartment complex. That's allowed under the collective knowledge doctrine, assuming that in the suppression hearing, the government substantiates the basis for that information in the record. And that's exactly what the government did here by calling Mr. Smith to testify. And I want to be clear about something. The government's position is not that this court should consider the entirety of Mr. Smith's testimony for purposes of the reasonable suspicion analysis. It's just what he told, what he testified he told 911. And he specifically testified that he told 911 the details that I said earlier. Gold Toyota Corolla at the pavilion, doing a re-up, giving drugs to transients. And this substance is important because it matches what Officer Jacobson knows about the area. It's not just generalized drug dealing, it's transients. Officer Jacobson testified that there's a corridor of movement that she receives three to four calls per shift regarding drug dealers and homeless people in this area. And of course- And that's also what the in-bank court said in Miscellany about a high crime area. Yes. In that case in El Paso. Right, exactly. So high crime is important. And here it's not just some generalized high crime. It's specific to the tip. It's the transient nature of the drug users. And it's also drug use and drug dealing itself. And so that's what really pushes this past NABARETTE. We do have that corroboration on scene regarding, one, just the identification. I know there's been a lot of discussion about all we did was corroborate the identification. We did that. There's no dispute it's the right car, make, color, model, in the right location. But we also have the observation upon arrival that the car is running, that there are occupants inside. Also consistent with active contemporaneous drug dealing activity. And then we have, of course, Mr. Wright's behavior upon exiting the vehicle. Officer Jacobson testified that usually when someone is removing themselves from a vehicle like that, they're trying to distance themselves from its contents. So that behavior is consistent with the report. Drug dealing activity that is active, that is ongoing. Again, the call log said this situation was in progress. It was both the subject and the caller were on scene. Can you give me the specific site of where he says, yes, he observed the drug dealing that day in that car? Because I'm looking- At ROA 155, is where he discusses specifically what he told dispatch. And again, I'm not suggesting- What he told dispatch, are you referring to the tipster? Correct. Yes, your honor. And again, that substantiated the basis for dispatch's knowledge. And then of course, which was in a shorthand form communicated to the officer at the scene. But even if we're limited to the shorthand, we know it's in progress. We know that the subject and the caller are on scene. We know it's drug dealing. We know the cross streets. We know the car. All of those things are corroborated upon Officer Jacobson's arrival. And so what really differentiates this case- This answer was kind of inconsistent with his earlier answer, which was more, I just saw people dealing. I mean, it's questionable to me whether he really said that based on the fact that his original answer didn't say that. I see my time is up, may I briefly respond? We know that the district court denied the suppression ruling. And the district court is the fact finder in this case. I know that, but it is a very strange testimony. The district court didn't reject that just by saying, I'm not sure he helped you that much. The district court's the one who asked the question. If you see on ROA 155, the district court's the one who specifically asked, would you tell 9-1-1? And for all those reasons, this court should affirm. Thank you. All right, thank you, Mr. Chappell. All right, for rebuttal. I just have a few brief points on rebuttal, your honors. Judge Barksdale, I wanted to, I can tell you exactly what Mr. Jacob Wright said when he stood up and stood still facing the officer exactly like this. He said, ma'am, I haven't done anything, right? And so, I mean, you can look at the video yourself and decide if that's an aggressive, threatening behavior. The officer certainly didn't testify that. She said it was aggressive to merely get out of the car. But again, that was in the context of the officer saying, it's odd for people who are seized to get out of the car, right? And so if he's already seized at that moment, him getting out of the car is totally irrelevant. And of course, he was seized. And so I do want to say, I will say, to be very clear, the main inconsistency with the government is not about their new position on appeal is not about when the stop occurred. I agree that in the trial court, they said it was the frisk. They were wrong about that, but that was what they said. Their new position on appeal that was in this 28J response and in the brief a little bit is that he hadn't submitted. Because there was no suggestion whatsoever that standing still and saying, ma'am, I haven't done anything and staying on scene was not submission to police authority or show of authority in the district court. And so that is brand new. But the main inconsistency, Your Honors, is not about when the seizure occurred. We'll live with the frisk if we have to, right? Because even so, the problem is that the tip wasn't enough. OK, so I want to get your understanding, because I found this a little bit confusing. And I'm still a little confused, because his original testimony was kind of just this generic drug trafficking. And then he gave this one specific answer about, I told him there was a gold Toyota doing a re-up, giving drugs to the transients to deal in the park, and they need to come and get them out of the park. And the officer has never remembered anything like that. But fact issues, we defer the district court. So what do you do with these differences in the record? My first answer, sorry, Judge Haynes, I didn't mean to speak over you. My first answer is that I do defer to the district court, because the district court rejected the tipster's testimony, and I don't want to say that. Yeah, I didn't think that the district court found that the tipster had seen a drug deal that day. I don't think that the district court found that either. What the district court said to the prosecutor was the tipster didn't help you very much, and then he immediately proceeded to credit the dispatch report and say, I'm looking at what the, and he's holding it in his hand. You can tell from the transcript, I'm looking at what the dispatcher wrote. There's suspicious people at a specific location, gold Corolla, they're drug dealers. So the district court credited the dispatch report, because of course, that is the contemporaneous record. Officer Jacobson testified it was the contemporaneous record. But if the district court believed this sentence, is it your position that's still not enough? Yes, because collective knowledge, you have to prove what the dispatcher knew. It's not what officers should have known. It's what they collectively knew. And so even if him saying what he said to the dispatcher is not proof that the dispatcher actually heard what he said and knew what he said. And I know that that is an actually important distinction. It would be one thing if those two things matched up. But what he says is different than what the dispatcher has on the report. And so if his recollection a year later can be treated as overriding and demonstrative of what the dispatcher knew, when of course the dispatcher would have been available to testify and the government didn't even attempt to bring the dispatcher in to testify, I think you should go with what the district court did here and say, I'm going to limit my consideration to what I believe the officer was actually acting on, which is the tip that she heard. But again, even the statement re-up is not a suggestion that I know the drug activity. It is an interpretation of something. We don't even know what a re-up is. He doesn't describe what a re-up means or that he knows what a re-up is. We don't know. And so I mean, again, that goes back to the ultimate basis in judge Haynes. I do want to pick up on this. There's a lot of stuff going on here, and the positions have changed. But we are happy to not rely on that at all, because we had this case as a slam dunk on this tip being exactly like the one that was in Florida versus JL and the tip without the predictive details from White. But the one thing that's here that isn't in any other case is indicia of unreliability. And you recognize the other thing that he said in his tip was that I have an AR-15 locked and loaded with armor-piercing rounds, and I'll do the police's job for them. So if we're going to rely on what the tipster said he said to the dispatcher at the hearing, that includes that threat as well. And that threat demonstrates indicia of animus, not indicia of reliability. As for these reasons, you should reverse. All right. Thank you. Your case is under submission.